THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT L. BROOKS, Defendant-Appellant.

First District (3rd Division)   No. 60684

Opinion filed July 29, 1976.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Laurence J. Bolon, Eugene J. Rudnik, Jr., and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

Defendant, Robert L. Brooks, was charged with murder. After a bench trial in the circuit court of Cook County, he was found guilty of that crime and was sentenced to a term of 14 to 100 years. On appeal, defendant contends that the trial court erred in not conducting a hearing to determine his fitness to stand trial; that the trial court erred in denying defendant's motions to quash his arrest and suppress certain evidence; and that he was not proved guilty of murder beyond a reasonable doubt. Prior to commencement of trial, it was stipulated that the motions to quash and suppress would be heard simultaneously with the trial testimony. In order to understand the issues, it is also necessary to set forth certain pretrial chronology.

On June 23, 1971, the public defender was appointed to represent defendant. On December 7, 1971, the assistant public defender asked leave to withdraw and attorney William Gerber filed his appearance. On November 14, 1972, the court was informed that Mr. Gerber was deceased and that defendant requested a bar association attorney. On November 21, 1972, attorney Warren Carey filed his appearance. On January 2, 1973, another assistant public defender filed his appearance. Finally, on April 26, 1973, Cornelius Toole, defendant's trial counsel, filed his appearance.

On the evening of April 8, 1971, Andre Sykes, while with his friend Charles Durham, was shot and killed. The pair were accosted by several young men in an alley on the west side of Chicago. A fist fight ensued. During the fight, another young man ran up, carrying a rifle. The deceased and Durham attempted to flee, but the man carrying the rifle shot and killed the deceased.

David Winter testified for the State that on the evening in question he was standing talking to his girl friend when he heard two shots come from the alley. Winter then saw defendant and someone known only as Fat Michael running out of the alley. Defendant was carrying a rifle and running toward his home. He identified defendant in the courtroom, and stated that he had known defendant for 15 or 16 years.

Charles Durham testified for the State that on the evening in question the decedent and he were looking for Durham's sister and girl friend. In the process, they walked down an alley where six young men asked the pair where they were going and where they came from. A fist fight began, with Durham fighting three men and the decedent fighting the others. Durham then noticed another young man about 19 years old running down the alley towards them, carrying a rifle. The deceased began running, and Durham followed him. When they reached the street, Durham turned and saw the man aim the rifle at them. Three shots were fired, and the deceased called out that he had been shot.

Durham viewed seven lineups, but made no identification. On the following day, he witnessed a lineup and identified defendant as the man who killed the deceased. He also identified defendant at trial. Durham testified that in his testimony before the grand jury he had stated that he was not absolutely sure of his identification of defendant, and that he did not get a good look at him during the incident. Durham testified, however, that he had time to think about it and he was sure that it was defendant who had shot the deceased.

During Durham's testimony, defendant interrupted to say: "I supposed to listen to this shit?" When the court cautioned him, defendant replied: "Nothing you can do about that." The court advised defendant to cooperate with his counsel, and defendant stated: "I'm not going to shut up. He is lying out of his teeth, man."

Officer William Nolan of the Chicago Police Department testified for the State that his partner and he were assigned to the homicide investigation. The officers interviewed several persons. They then took into custody two persons named Austin and Hall who had been described to them as having been involved in the homicide. They interviewed several other persons. As a result, the officers had received the name and address of the person whom they sought, but had received no physical description of the accused. Accompanied by other officers, Nolan went to

the address which he had received. Defendant answered the door and gave his name. Officer Nolan immediately arrested him and gave him his *Miranda* warnings. At the station, defendant first denied any involvement in the shooting. About 45 minutes later, defendant agreed to tell what happened and then gave a written confession in the presence of Officer Nolan, an assistant State's Attorney, and a court reporter. In the confession, defendant revealed where he had hidden the rifle.

Before beginning cross-examination of Officer Nolan, defense counsel had a conference in chambers with the trial court and prosecutor in which defense counsel indicated that he had prepared his cross-examination of the police officer predicated on the belief that defendant would testify. Now, defendant was refusing to testify, was threatening his counsel, stating that he did not want to be represented by him, and was refusing to cooperate. Defense counsel then requested a mistrial. The judge expressed sympathy with counsel, but stated that defendant had not gotten along with his previous attorneys. Defendant had discharged one lawyer on a day set for trial. The judge further commented that he would order a behavior clinic examination if he thought it was in order, but that he did not believe it would be helpful. The judge indicated that defendant had been more cooperative with trial counsel than with his previous attorneys. The court made a finding that defendant was able to cooperate, but refused to do so. The conference concluded with defense counsel stating that defendant had been cooperating and had promised to behave, but now defendant had his counsel caught "in between."

When the trial resumed, defendant stated he did not want counsel representing him because: "He don't know shit." The trial court informed defendant that counsel would continue to represent him and that the court would exclude defendant if he continued his language. Defendant replied that the judge could not exclude him from the trial. When the judge insisted that he could be excluded, defendant stated that he did not understand, and went on to say: "I don't understand nothing." Defendant, however, made no further comment until he was called as a witness.

Police investigator Lee Anderson testified that on April 9, 1971, after the interrogation of defendant he obtained a search warrant to search defendant's home to recover the rifle. The offer was admitted into the home by defendant's brother. The officer immediately went upstairs to the bathroom and located a full-length mirror behind which was a small storage room. Inside, the officer found a .22 rifle and a box of .22 rifle ammunition. The rifle and ammunition were introduced into evidence.

It was stipulated that if Dr. Edward Shalgos, the county pathologist, were called to testify, he would state that in his opinion the cause of death to the deceased was a bullet wound to the chest, penetrating the heart.

Defense counsel called defendant to testify. Defendant refused, saying:

"I said no, I told you once." The defense then rested. After finding defendant guilty, the trial court ordered a behavior clinic examination just as defense counsel was about to request such an examination. The doctor reported back to the court that because of defendant's refusal to cooperate he was unable to determine if defendant was mentally fit to stand trial. The doctor was unable to determine whether the lack of cooperation was based on a mental condition or a characteristic rage reaction. At the sentencing, defendant said that he did not talk to the doctor because he did not wish to, and that he would not talk to him. Defendant filed a motion for a new trial alleging his unfitness to stand trial and his inability to understand the proceedings. The trial court denied the post-trial motion.

■■ Defendant's initial contention is that he was unfit to stand trial and that the trial court erred in not conducting a hearing to determine his fitness to stand trial. He urges that a bona fide doubt of his fitness to stand trial was demonstrated by his inability to cooperate with any of the attorneys assigned to defend him, and that his conduct at trial revealed that he was unable to understand the nature of the proceedings, or to assist in his defense.

Illinois statute (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1(a)) provides:

"For the purposes of this section a defendant is unfit to stand trial or be sentenced if, because of a mental or physical condition, he is unable:

(1) to understand the nature and purpose of the proceedings against him; or

(2) to assist in his defense."

A determination of defendant's fitness is to be made when a bona fide doubt of his fitness is raised. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1(c).) Ordinarily it is within the discretion of the trial court to decide whether a doubt exists as to the fitness of the defendant to stand trial. *People v. Pridgen* (1967), 37 Ill. 2d 295, 226 N.E.2d 598; *People v. Milligan* (1963), 28 Ill. 2d 203, 190 N.E.2d 753.

In our view, the succession of attorneys who represented defendant prior to trial does not of itself raise a bona fide doubt of defendant's fitness to stand trial. In that connection, it should be noted that one of his attorneys died and twice the public defender was appointed to represent defendant. Indeed, in viewing the record and particularly the fact that defendant discharged one of his attorneys on a date that the matter had been set to go to trial, it appears that defendant was very much aware of the nature and purpose of the proceedings. The record does not reveal any prior history of mental illness or disorders. Moreover, it is significant that none of his attorneys, prior to trial, ever requested a psychiatric examination or a hearing to determine defendant's fitness to stand trial.

We hold that defendant's dissatisfaction with the various attorneys who represented him prior to trial did not create a bona fide doubt of his fitness to stand trial. See *People v. King* (1973), 54 Ill. 2d 291, 296 N.E.2d 731.

■■ Nor do we believe that defendant's conduct at trial raised a bona fide doubt of defendant's fitness to stand trial. After the resumption of trial following the conference at which defense counsel requested a mistrial, defendant made a few crude remarks to the effect that his trial counsel knew nothing and that he wanted another attorney. The trial court admonished defendant that if he persisted in his language he would be excluded from the trial. Defendant challenged the court's right to exclude him. When the court renewed the admonition, defendant said he did not understand. However, he remained silent through the balance of the State's case.

It seems apparent from the proceedings that defendant was able to cooperate with his counsel, but was unwilling to do so. While defendant purported not to understand the court's admonishment about excluding him from the trial or "to understand anything," it is significant to observe that defendant did remain quiet thereafter. Defendant, even in his comments, revealed an understanding of the nature and purpose of the proceedings. While defendant refused to cooperate with his attorney, he did not demonstrate an inability to assist in his defense. We also deem it of note that, although defense counsel requested a mistrial, he did not seek a hearing on defendant's fitness to stand trial. Even when the trial court commented on a behavior clinic examination, defense counsel made no request for such an examination or a hearing to determine defendant's fitness.

■■ Prior to sentencing, the trial court ordered a behavior clinic examination of defendant. The fact that the trial judge, after trial, ordered such an examination does not in itself indicate a serious doubt of defendant's fitness. (*People v. Russo* (1972), 52 Ill. 2d 425, 288 N.E.2d 412.) After the examination was ordered, the psychiatrist reported back to the court that he was unable to determine defendant's fitness because of defendant's refusal to cooperate. When defendant was asked by the judge why he had refused to cooperate with the doctor, defendant replied that he did not talk to the doctor because he did not wish to, and further asserted that he would not talk to the doctor. We conclude that the conduct of defendant did not raise a bona fide doubt of his fitness to stand trial, and that the trial court did not abuse its discretion in not conducting a hearing to determine defendant's fitness.

Defendant next contends that the trial court erred in denying defendant's motions to quash the arrest and suppress the evidence. He argues that the police officer did not have probable cause to arrest him

because all the officer had at the time of the warrantless arrest was "a name."

Probable cause to effect a warrantless arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient to convince an individual of reasonable caution that an offense has been committed. (*People v. Colbert* (1973), 10 Ill. App. 3d 758, 295 N.E.2d 225; *People v. Asey* (1967), 85 Ill. App. 2d 210, 229 N.E.2d 368.) Hearsay evidence, otherwise inadmissible in a trial, may be considered in determining the existence of probable cause. *People v. La Bostrie* (1958), 14 Ill. 2d 617, 153 N.E.2d 570.

■■ In the present case, Officer Nolan testified that after he was assigned to the homicide investigation in question he interviewed several persons whom he named. Among those he interviewed were two men who were involved in the occurrence. The officer further testified that as a result of these conversations he had obtained the name and address of the person he sought. The house in which defendant lived had been pointed out to him. The officer had not obtained a physical description of the person. The officer went to the house to which he had been directed. The defendant answered the door and identified himself by name. The officer immediately arrested him and gave him his *Miranda* warnings. The officer had been specifically supplied with defendant's name and had confronted him in his own home. Under the circumstances, the officer had probable cause, equivalent to reasonable grounds, to believe that a crime had been committed and that defendant had committed it. The trial court correctly denied the motion to quash the arrest and suppress the evidence.

In view of our holding that the officer had probable cause to arrest defendant, it is unnecessary to consider defendant's argument that defendant's illegal arrest tainted the subsequent affidavit and complaint for a search warrant, and that the court erred in denying defendant's motion to suppress the rifle.

■■ We find no merit in defendant's final contention that the State failed to prove him guilty beyond a reasonable doubt. One eyewitness testified that he saw defendant shoot the deceased. Another witness testified that he saw defendant emerge from the alley carrying a rifle immediately after the witness heard shots fired. In addition, defendant's confession was properly admitted into evidence, and that confession was corroborated by the recovery of the rifle.

For the reasons stated, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

DEMPSEY and McGLOON, JJ., concur.