THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JERRY WALKER, Defendant-Appellant.

First District (5th Division)   No. 77-1821

Opinion filed September 28, 1979.

Edward M. Genson and Jeffrey B. Steinback, both of Chicago (Cheryl Harris, law student, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Pamela E. Loza, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

After a bench trial, defendant was convicted of armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 18—2) and burglary (par. 19—1) and sentenced to concurrent terms of 6 to 24 years and 3 years mandatory parole for the armed robbery and 2 to 6 years for the burglary. On appeal, he raises several issues concerning the trial and the trial court's resolution of his petition for a determination of competency. We affirm on all points raised.

## I

Defendant first contends that he was not proven guilty beyond a reasonable doubt.

The State's evidence indicates that the crimes with which defendant was charged were committed during a 15- or 20-minute period of time on June 17, 1975, in the home of Mr. and Mrs. Glen Church.

Mr. Church testified that during the evening he and his wife were sitting in the living room of their home at 14209 South Cicero. The living room was well lighted, having three working lamps, two having 200-watt bulbs and one having a 100-watt bulb. The living room had a fireplace on the east wall and a large mirror above it. The south wall was fully covered with a mirror. At about 9:50 p.m., two men, one of whom Mr. and Mrs. Church later identified as defendant both after the incident and in court, entered the front door to the Churches' home, announced a holdup, and ordered both Mr. Church and his wife to get up against the east wall with their hands raised and faces turned toward the wall. Although Mr. Church said he was not an expert with guns, he stated that defendant was holding a shotgun-type weapon and his partner was holding a smaller gun throughout the evening. Mr. Church was grabbed by the hand and taken to the east wall. As he walked to the wall he could clearly see the faces of defendant and his partner in the mirror above the fireplace. When he reached the wall, defendant's partner demanded $10,000 from the Churches. Mr. Church told him that all he had was $40 and that it was in his billfold. Later in the evening, he discovered that the $40 was missing from his billfold.

Sometime after Mr. Church had told them about the money in his billfold, his dog came into the room and started barking and biting at defendant. Defendant told Mr. Church to shut him up or he would shoot the dog. Mr. Church then turned around, faced defendant who was about a foot away, and then bent down to quiet the dog. After doing so, he stood up and turned around to face the mirror again. Mr. Church testified that he had an opportunity to observe defendant when he first turned around.

After the dog had been quieted, defendant's partner ordered defendant to take Mrs. Church to get her purse. Defendant followed her into the bedroom where she thought she had left the purse. While they were in the bedroom defendant's partner ordered Mr. Church to sit beside him on the couch. After awhile, Mrs. Church came out of the bedroom and went into the kitchen, with defendant still following her. Soon, they came out of the kitchen with defendant carrying her purse. Defendant's partner then told defendant to give him the purse and ordered the Churches to go back to the fireplace.

Once the Churches had returned to the fireplace, defendant's partner again asked for $10,000. Mr. Church testified that by looking through the mirror, he could see defendant standing behind him with gun in hand. Defendant told Mr. Church that it was too late and then "unracked" his

gun. Defendant's partner told the Churches to "get your head down between your legs, this is it." At that point the doorbell rang.

Defendant's partner told defendant to take Mr. Church to the door and warned Mr. Church not to try anything or his wife would get it. Mr. Church and defendant walked to the back door. When they got there, Mr. Church ran through the back door and saw his son and daughter-in-law standing at the door. He then ran around to the front door and saw defendant and his partner fleeing.

The police arrived on the scene within five minutes. Mr. Church gave one of the officers, Sergeant Foster, a description of defendant. He told him that defendant was short, weighed 130 pounds, and wore a loud sports shirt, brown pants, a black sports cap, and dark shoes with high heels. Within minutes Foster received a call on his radio directing him to 144th Street and Kenton, about two or three blocks from the Church residence. After Foster and Mr. Church had arrived at that address, three or four policemen brought a man before the flashing lights of a squad car. Mr. Church identified the man as defendant. This identification occurred approximately 15 minutes after Mr. Church had seen defendant and his partner running from his house.

Mrs. Church testified to many of the same facts as her husband. She confirmed that the lights were on in the living room when defendant and his partner entered their home, and she also stated that the fluorescent ceiling lights were on in the kitchen when she handed her purse to defendant. She said that she was able to see at least a part of defendant all during the evening. While she was standing at the fireplace facing the east wall, she could not see defendant through the mirror on that wall because it was placed at a height beyond her eyesight, but she could see him standing behind her and her husband through the mirror on the south wall. When her husband turned to quiet their dog, she also turned and stood about a foot away from defendant. When she found her purse, she turned towards defendant and handed him the purse. She described defendant as being a little under 5 feet 2 inches tall, and as wearing a loud shirt, brown pants, black cap, and black shoes. She did not notice that defendant had any physical deformities and said that he firmly held the shotgun-type gun throughout the evening.

Sometime after the incident, the police drove Mrs. Church to the stationhouse to identify defendant. When she arrived, she saw defendant sitting at a desk and making a phone call. After identifying defendant to the police, she went home and discovered that a silver dollar and an autographed dollar bill were missing from her purse.

Sergeant John Foster, a village of Crestwood police officer, testified that he arrived at the Church residence at about 10:10 p.m. About 10 or 15 minutes later he went to 144th Street and Kenton. When he arrived, he

saw a man later identified as defendant, standing with 10 other policemen. Defendant was wearing a loud sport shirt, brown pants, and brown shoes with about 2-inch heels. Two police officers took defendant in front of a squad car and there he was identified by Mr. Church. A "whole bunch" of police officers were standing by the squad car when defendant was identified. When Foster arrested defendant, he had no more than 17¢ on him. Foster never recovered the gun which defendant allegedly used during the armed robbery and burglary. He admitted that in his police report he had stated that defendant used a submachine gun during the incident. He stated that although a footprint had been found on the rug in the Church residence, he was unable to identify it. Also, he stated that later at the police station, defendant told him that he did not commit the crimes and that he had been at a hot dog stand in Blue Island at the time of the crimes. He also stated that Mrs. Church made her identification of defendant about 20 minutes after he was arrested.

The defense presented evidence indicating that defendant left his home at about 9:40 p.m. on June 17, 1975, to drive his girl friend home and that they stopped at a hot dog stand in Blue Island at about 10 p.m.

Defendant first testified that he could not hold very much in his hands because his forefingers had been broken since first grade and the thumb of his left hand was bent. He stated that he could not hold a gun because of these infirmities. He also stated that he was 4 feet 9 inches tall.

Defendant then testified as to his whereabouts on June 17, 1975. At about 4 p.m., he picked up his girl friend, Carol Ford. At about 5:55, they drove to the Midlothian train station to pick up his mother. At about 6 p.m., his mother arrived, and they drove home, arriving sometime around 6:15 or 6:30. Between 6:30 and 9:20, defendant worked on the brakes on his car. During this period, he used a jack to remove a wheel and then used a screwdriver and a pair of pliers to remove a brake drum. Although he indicated that both of his hands hurt and he could not use his right hand, he said that he could hold a tool in his left hand. After defendant replaced the drum and the wheel he took his car for a test ride. After driving a short distance, he noticed something smoking and he returned the car to his home. After parking the car he asked his mother if he could use the family truck to drive Carol home. She agreed. At 9:30 p.m., defendant went into the house to clean up. He said that he knew it was 9:30 because he remembered looking at the clock. At about 9:40 he and Carol proceeded to her home.

On the way to Carol's house, defendant stopped at Bozo's or Boz's hot dog stand in Blue Island. Defendant was sure that they arrived there at 10 p.m. because he remembered looking at a clock. After they finished eating in the truck, defendant drove Carol home and returned to his house at about 10:30 or 10:35. He went inside for a minute and then came back

outside. He then saw police cars shining spotlights into his yard. Defendant walked onto the street and asked the police what they wanted. He then heard a police officer ask another officer if defendant was the man they were looking for. Eventually defendant was handcuffed and taken in front of one of the squad cars.

Carol Ford, defendant's girl friend, testified to the same essential facts as did defendant. In addition she stated that she lived six or seven miles from defendant's house. She also stated that when defendant brought their order from the hot dog stand the time was 10:06. She knew this because she had heard the time announced on the radio. Annette Walker, defendant's mother, corroborated much of defendant's testimony including the time when he left to take Carol home and when he returned home. In addition she testified that defendant had been working on his car off and on all day on June 17, 1975. She said that he often worked on his car.

Robert Fisher, the owner of Bozo's or Boz's hot dog stand, testified that defendant came by at some time on June 17, 1975, but that he had no idea when. He said the visit could have occurred "anywhere from 7 p.m. to maybe 10 p.m."

● 1 Despite the alibi offered by the defense, we find that the evidence was sufficient to convict defendant of the crimes charged beyond a reasonable doubt. We are particularly impressed by the strong identification testimony of the Churches. During the occurrence, both Mr. and Mrs. Church had ample opportunity to view defendant under good lighting conditions. Even when they were facing the wall, they were able to see the defendant through one of the wall mirrors. Shortly after the defendant fled from the scene of the crimes, Mr. Church gave the police a description of defendant which apparently led to his arrest only a few blocks away from the Church residence. We do not think the fact that defendant was arrested wearing brown shoes or that he was not wearing a black cap is significant because there was a time period after the incident during which clothing could have been changed or discarded. Also, after the occurrence, both of the Churches pointed out defendant to the police officers within an hour of the crimes. They also unhesitantly identified defendant in court. We believe that this evidence constitutes a strong and positive identification.

We reject defendant's claims that his alibi evidence and the absence of physical evidence linking him to the crimes raise a reasonable doubt of his guilt. The alibi evidence creates no more than a conflict between the testimony of the State's witnesses and the testimony of the defense witnesses. The trial court in rendering its decision obviously believed the State's witnesses and disbelieved the defense witnesses. As trier of fact, the court has the responsibility to resolve conflicts in testimony. In light of

the strong and positive identification testimony of the Churches, we cannot say that the court erred in accepting their testimony and rejecting the defense witnesses' testimony. (*People v. Haynes* (1970), 131 Ill. App. 2d 319, 266 N.E.2d 681.) For a similar reason, we cannot say that the failure of the police to recover the money and the gun or to find any fingerprints or footprints linking defendant to the scene of the crime creates a reasonable doubt of defendant's guilt.

Defendant next contends that the trial court committed reversible error when it failed to sustain his motion to suppress the eyewitness identifications of him where he was subjected to overly suggestive one-man show-ups. Defendant claims that Mr. Church's identification of him when he was standing handcuffed with police officers in front of a squad car and Mrs. Church's stationhouse identification were improperly admitted at trial in derogation of his right to due process of law, as they were both unnecessarily suggestive and conducive to irreparable mistaken identification. We disagree.

■■■ The practice of showing suspects singly to a person for purposes of identification has been condemned because of the unfair focus which it places on one individual. (See *Stovall v. Denno* (1967), 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967.) Nevertheless, such a practice has been approved where (1) a witness had an excellent opportunity to observe defendant during the commission of the crime and only a small period of time transpired between the crime and the confrontation (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313; *People v. Flemming* (1977), 47 Ill. App. 3d 755, 362 N.E.2d 691) and (2) a victim has made an unsolicited identification of defendant (*People v. Grant* (1976), 38 Ill. App. 3d 62, 347 N.E.2d 244). In the instant case, the evidence indicates that Mr. Church, who had an excellent opportunity to observe defendant during the commission of the armed robbery and burglary, made his identification about 15 or 20 minutes after defendant fled the Church residence. Mrs. Church, who also had an excellent opportunity to observe defendant during the commission of the crimes, made her identification approximately 35 or 40 minutes after defendant fled. In addition, Mrs. Church made her identification under what can properly be termed "inadvertent" circumstances. After being taken to the police station to make an identification, she saw defendant sitting at a table making a phone call and she made an immediate identification of him to the police. Under these facts, we see nothing overly suggestive about either of the victims' identifications.

Defendant contends that the trial court committed reversible error when it failed to *sua sponte* order a hearing to determine defendant's fitness to stand trial. He asks us to consider several passages during defendant's cross-examination which he claims should have at least raised

a bona fide doubt as to defendant's fitness in the mind of the trial court. Upon careful consideration of these passages together with the rest of defendant's testimony, we find no reason for the trial court to have ordered a hearing on defendant's fitness.

Defendant next contends that the trial court committed reversible error when it failed to properly respond to his petition for a judicial determination of both his competency to stand trial and to be sentenced. Defendant filed his petition after he was found guilty but just prior to sentencing. He included as part of his petition an evaluation by Larry Gunn, a psychologist, in which he gave his opinion that defendant had not been competent to stand trial. During discussions on the petition, the court indicated:

> "This is a petition for judicial examination as to defendant's fitness to stand trial or to be sentenced. In any event, this is the time when sentencing is concerned."

The court then ordered a BCX and heard testimony on the results of the BCX. At the close of the testimony, the court ruled that defendant was fit to be sentenced. The court did not make any ruling on defendant's competency to stand trial. However, the trial court subsequently denied defendant's post-trial motion which included a contention that the trial court erred in failing to order a hearing on his competency to stand trial.

The trial court's ruling on defendant's post-trial motion constitutes a ruling on his earlier request for a judicial determination of his competency to stand trial. Thus, we need only concern ourselves with whether that ruling was proper.

■ An individual is fit to stand trial if he can understand the nature and purpose of the proceedings against him and assist in his own defense. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1(a).) When there is a bona fide doubt of his fitness to stand trial the trial court is required to make a determination of his fitness before proceeding further with the trial. (Par. 1005—2—1(c).) Ordinarily, the determination of whether a bona fide doubt exists is within the discretion of the trial court and its decision will not be overturned absent an abuse of discretion. *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.

■ We find that the facts in this case were such that the court did not abuse its discretion in not ordering a hearing. As we have already indicated, there was nothing in defendant's testimony or in his manner of testifying which would indicate any inability to understand the nature of the crimes charged or to assist in his defense. (See *People v. Burnside* (1977), 52 Ill. App. 3d 524, 367 N.E.2d 733.) On the contrary, his alibi testimony generally was clear and he appeared to be cooperative throughout the trial. Another factor in our decision is that there were no requests for a competency hearing made either before or during trial by

defendant's counsel. (See *People v. Brooks* (1976), 40 Ill. App. 3d 996, 353 N.E.2d 234.) Though we are not unaware of the fact that defendant's appellate counsel raised a question concerning defendant's trial counsel's competency in a supplemental post-trial motion, that issue has not been raised on appeal and upon review of the record we see no evidence of such alleged incompetence. Also, another factor in our decision is that there was no testimony or other evidence that defendant was at any time insane or incompetent either before or during the trial. See *Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836.

Defendant claims, however, that the evaluation by Larry Gunn, which was attached to his petition, raises a bona fide doubt of his competency to stand trial. In Gunn's evaluation, which was conducted after the trial, he did indicate that he believed that defendant was not competent to stand trial at the time when the trial took place. However, in light of the absence of any other indication at trial that defendant was incompetent we cannot say that the trial court's decision not to allow a hearing constituted an abuse of discretion.

## II

Defendant next raises a number of contentions concerning the hearing at which he was found to be competent to be sentenced. He contends that the trial court erred when it (1) sentenced defendant after the State had not proven his fitness to be sentenced by a preponderance of the evidence; (2) misapprehended the standard of fitness to be sentenced; and (3) misapprehended the proper burden of proof at the fitness hearing.

At the hearing, Doctor Martin Ziporyn, a psychiatrist, testified that he interviewed defendant for 45 minutes on June 10, 1977. Based on this interview he concluded that defendant was mentally retarded and was not fit to be sentenced or to stand trial. In particular, he noted that defendant had a normal memory, a good capacity to be well oriented in time and place, and slow but valid cognitive abilities. He explained that defendant could answer his questions, sometimes only after the questions were rephrased and always after considerable reflection, but that he had difficulty with abstract thinking. He said that defendant did know the difference between right and wrong, had knowledge of the nature of his acts, and could perceive the consequences of his acts on a concrete cause and effect basis.

Ziporyn also noted that defendant did understand the nature and the purpose of the sentencing procedures but that he could only poorly assist in his defense because "he doesn't understand what is required of him and his ability to discuss his motivations and circumstances is very poor." He said that defendant could understand that he would go to jail as a result of having been found guilty, but that he would not be able to

understand the significance of prison. Because of this, Ziporyn believed that prison would be useless in terms of rehabilitation.

Larry Gunn, a clinical psychologist, testified that he gave defendant a series of tests over a one-hour-and-15-minute period on June 24, 1977. Based on the results of these tests, he concluded that defendant was moderately retarded with some organic or neurological disturbance. He specifically said that defendant had an extremely poor memory and had difficulty communicating with him and he had major difficulty communicating with defendant.

Doctor Gersen Kaplan, a psychiatrist, testified that prior to interviewing defendant on August 1, 1977, he reviewed reports by a staff psychologist and a social worker on tests given defendant. He interviewed defendant for approximately 45 minutes. As a result of the interview and the information contained in the reports, he concluded that defendant was mildly retarded but that he was competent to be sentenced. He further stated that he did not consider the question of competency to be even close.

In particular, Kaplan testified that during the interview he could understand defendant and said that it did not appear that defendant was having any difficulty understanding his questions. Defendant told him about the crimes he was charged with and said that he was innocent of the charges. He also told Kaplan that he understood the nature of the proceedings against him, could discuss his case with his attorney, and understood that he could spend time in jail. At one point, defendant mentioned the possibility of his going to jail for four years.

Kaplan believed that defendant understood what was going on in the courtroom because he was "streetwise." He believed that defendant could think abstractly to a limited extent and he definitely felt that defendant understood cause and effect. He thought that if defendant were to have any problems with rehabilitation they would be based mainly on his value system, which was still subject to modification. He did not feel that defendant's intellect would be the major obstacle to his rehabilitation.

■■ In evaluating the evidence which was before the trial court we must bear in mind that the conclusions reached by the various experts are only as valid as the bases or reasons for them. (*People v. Bilyew* (1978), 73 Ill. 2d 294, 383 N.E.2d 212.) Valid conclusions must be based on testimony which would indicate that defendant could understand the nature and purpose of the sentencing proceedings and could assist in his own defense. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—2—1(a).) After reviewing the testimony of the experts, we cannot say that the trial court erred in finding that defendant had been proven to be fit to be sentenced by a preponderance of the evidence.

Both Doctor Kaplan and Doctor Ziporyn offered testimony which would support a finding of competency. Kaplan concluded that defendant was competent to be sentenced and his testimony clearly supports such a conclusion. Although Ziporyn reached an opposite conclusion, we believe that his testimony also supports a conclusion of competency. He stated that defendant did understand the nature and purpose of the sentencing proceedings and that he could assist in his defense, albeit poorly. He also stated that defendant had a normal memory, a good capacity to be well oriented in time and place, and slow but valid cognitive abilities. When we consider such testimony, even in light of the conflicting evaluation and testimony of Larry Gunn, we cannot say that the trial court erred in its ruling.

We also cannot say that the trial court either misapprehended the standard of fitness to be sentenced or the proper burden of proof. Although the trial court did ask two of the experts if defendant could differentiate between right and wrong, we do not believe that a fair reading of all of his questions could lead to a conclusion that that was the standard which he was using in determining competency. The clear thrust of his questions was to determine if the experts felt that the defendant understood the nature and purpose of the sentencing proceedings and could assist in his defense. We also find no error in the court's allocation of the burden of proof. It is clear from the record that the court recognized that the burden was on the State.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.