THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. ANDRE SHELBY *et al.*, Defendants-Appellees.

First District (5th Division) Nos. 1—88—2706, 1—88—3207 cons.

Opinion filed November 8, 1991.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Jane E. Loeb, and William Marback, Assistant State's Attorneys, of counsel), for the People.

Randolph N. Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellee Michael Caples.

David T. Cherney, of Stein & Cherney, Ltd., of Chicago, for appellee Andre Shelby.

JUSTICE GORDON delivered the opinion of the court:

Defendants Andre Shelby and Michael Caples were charged by indictment with first degree murder (Ill. Rev. Stat. 1985, ch. 38,

pars. 9—1(a)(1), (a)(2), (a)(3)) and burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)). Prior to trial, Shelby and Caples each filed motions to quash arrest and suppress evidence on the grounds that their arrests were illegal, and motions to suppress statements on the grounds that their statements to police were not made voluntarily. Both defendants' motions to quash arrest and suppress evidence were sustained, while both motions to suppress statements were denied. From these orders sustaining defendants' motions to quash arrest and suppress evidence, the State now appeals. For the reasons set forth below, we affirm the trial court's order on Shelby's motion and reverse its order on Caples' motion.

FACTS

Defendants, along with Lavaitis Wilson, Levi Boykins, Gregory Johnson, Willie Broughton, Isaac Holden and Kenneth Broughton, were charged with the August 22, 1987, murder of Julio Palomo and with burglary of a truck. Defendants Shelby and Caples were arrested in the early morning hours of August 24, 1987. On January 22, 1988, Caples filed a motion to suppress statements he made to the police following his arrest, alleging that his statements were not made voluntarily. On February 29, 1988, Shelby filed a motion to quash arrest and suppress evidence, alleging no probable cause for his arrest, and a second motion to suppress statements on the grounds that they were not voluntarily made. In June 1988 joint hearings were held on Shelby's two motions and Caples' single motion. (Caples later filed a motion to quash his arrest and suppress evidence. That motion was considered at a separate hearing, discussed later in this opinion.) Although evidence was presented at the June hearings relating to the voluntariness of defendants' statements, this statement of facts will focus primarily on the evidence presented pertaining to the issue of probable cause to arrest Shelby and Caples, since it is the granting of the motions to quash arrest and suppress for lack of probable cause which are the subject of this appeal by the State.

Cozetta Fairchild, Shelby's mother, testifying for her son, said she lived with her son at 910 W. 87th Street, a house with an enclosed front porch, a basement, first and second floors, and an attic. At approximately 3 to 4 a.m. on August 24, 1987, she was asleep in her room in the attic, when she was awakened by knocking at her front door. When she went to the door, she saw several police officers at the door to the porch. Fairchild said she opened the door but did not invite the officers in. They told her they were

looking for Andre and asked if he was home, to which she replied "no." Without her permission, the police entered the house to search for him, and she observed the officers escort her son "down from upstairs." Shelby was handcuffed when the police led him down the stairs.

Fairchild further testified that the police told her they had seen someone in the basement, and she told them that there was not supposed to be anyone there. Several of the officers went into the basement to look for the man they claimed to have seen. Fairchild did not expressly consent to this search, nor did she expressly object. She testified that she felt she had no choice but to allow the police to search the house.

Finding no one in the basement, Fairchild then accompanied the police to the second floor, where there were four locked bedrooms. She unlocked two of the rooms, and one room was unlocked by a boarder. The police used Fairchild's keys to unlock Andre's room. Andre was not found in any of those rooms. Fairchild said the police then took her back down to the first floor, while several officers went to the attic, where they located Andre.

Detective George Holmes, a 16-year veteran of the Chicago police department, testified for the State. When he came on duty at 8:30 a.m. on August 22, 1987, he was assigned to the investigation of the murder earlier that day of Julio Palomo. He was told that Palomo had been beaten to death by 5 to 10 people at the corner of 59th and State Streets while trying to stop a burglary from a truck.

Holmes went to the scene of the murder shortly thereafter and was approached by John Williams. Williams told Holmes that he had seen the incident from inside a van which was parked nearby. Holmes further testified that Williams told him that one of the participants in the beating was referred to as "Big Mike" by another participant. Williams had seen "Big Mike" in the area before the murder, but had not heard his name previously. Williams described "Big Mike" as 6 feet to 6 feet 1 inch tall, weighing approximately 200 pounds.

Continuing his testimony, Holmes stated that on August 23, 1987, he had a conversation at the police station with Levi Boykins, who was previously identified by witnesses as a participant in the beating. Boykins gave Holmes names of the following additional participants: "Ali Kahn," "Big Mike," "Andre," "Stinky," "Little Gun" and "Gun." Although Holmes said that the police attempted to get information from police department records about those

whom Boykins had named, he was not asked nor did he reveal whether any such information was found.

Boykins told Holmes that "Stinky" was Lavaitas Wilson and that "Andre" was the brother of Lavaitas Wilson's mother. According to Holmes, the police had already determined where Wilson's mother resided. Holmes said that Boykins suggested that if "Andre" was not at Wilson's mother's house, they should "check on 87th Street near Vincinnes [sic] in a building that would be across from a video store and would have new sliding glass doors in the front of it."

Detective Holmes testified that late on August 23 or early on August 24, he went to Wilson's house but was unable to locate "Andre" or any of the other named suspects there. At approximately 4 a.m. on August 24, Holmes and three other officers proceeded to Vincennes and 87th, where they located a building, 910 W. 87th, with a new sliding glass door on the front porch. Getting no response from knocking or ringing the door bell, Holmes said he looked through an open louver in a basement window and saw a male black subject. When Holmes identified himself as police, this person disappeared from sight.

Several minutes later, after continued knocking and ringing, Cozetta Fairchild answered the door. When told that the police had seen a man in the basement, Fairchild said there were no males in the building. Holmes, however, testified that he saw a man walking down stairs from the upper floor. Fairchild then admitted that her boyfriend and a male boarder were in the house.

Holmes explained that they wanted to talk with her son Andre and asked if they could look around. According to Holmes, she consented. The police found Andre in the attic, lying on the floor halfway under the bed, with a pile of clothes around him and a child lying on top of him. He was then handcuffed and told he was under arrest.

After leaving Fairchild's house, Shelby told the police that he would show them the house where "Big Mike" lived. Shelby directed them to 120th and Stewart, where he pointed out a house to them and identified a red Monte Carlo as "Big Mike's" car. While the police and Shelby were standing outside looking at the Monte Carlo, a person came out of the building at 12050 Stewart, and Shelby said "That's Big Mike."

As they approached the person whom Shelby had identified, the police asked him if he was Mike. The suspect said nothing and turned to go back in the building. The police then went up to him

and told him he was under arrest. According to Holmes, the suspect resisted, and after a struggle, he was handcuffed. The suspect was later identified as the defendant, Michael Caples.

On cross-examination, Holmes clarified that the only information they had regarding Andre Shelby, prior to Shelby's arrest, was from Levi Boykins, following Boykins' arrest. Holmes said that he did not attempt to get an arrest warrant for Shelby or a search warrant before going to 910 W. 87th. He said that he was not aware of any judge from whom he could obtain a warrant in the early morning hours of August 24.

Holmes further testified that Shelby was immediately placed under arrest when they found him in the attic bedroom at his mother's house. In the police car following his arrest, Shelby denied any knowledge of the beating.

Detective Patricia Harrison testified that she was present when Shelby was arrested. After being removed from the house, Shelby was placed in a police car and advised of his *Miranda* rights. According to Harrison, Shelby said he could show the police where "Big Mike" resided.

The next witness for the State was Detective Robert Utter. Utter testified that when he and two other detectives approached Caples on the front porch of his house, he saw Caples put something in his mouth, and then turn to go back into the house. When the police said "wait a minute, hold it," Caples turned back toward the police. The police then told Caples he was under arrest, and a struggle ensued as they tried to handcuff him. The struggle lasted about a minute.

Andre Shelby testified on his own behalf. He was 20 years old when he was arrested at 4 a.m. on August 24, 1987. In the police car after his arrest, the police asked him if he knew where "Big Mike" lived. Shelby said he told them where "Big Mike" lived because the police hit him in the leg with a flashlight.

Michael Caples testified as to his arrest. He said that he was inside the house where he lived when he heard noises outside sometime between 4 and 5 a.m. on August 24, 1987. He went to the door and looked outside, where he saw three police officers approaching him. Caples also saw Andre Shelby standing on the sidewalk with another officer. He said that he did not try to go anywhere when the officers approached him in front of his house. When asked his name he answered that he was Michael Caples. He did not resist arrest or the attempt to handcuff him. Nevertheless, the officers beat him on the arms and the ribs.

Following closing arguments, the court denied Caples' and Shelby's motions to suppress statements on the ground of involuntariness. As to Shelby's motion to quash his arrest and suppress evidence on the ground that the arrest was made without probable cause, the court focused on the testimony of Detective Holmes. The court said:

> "Defendant was identified by Levi Boykins after Mr. Boykins was charged with the offense. The nature of the identification, the basis for Mr. Boykins' information is not apparent from the State's case, nor is there any evidence of corroboration of what might have been related to Mr. Boykins. I really don't know what was related to Mr. Boykins.
>
> There was also at the foundation of the motion to quash arrest the contention that the Police even if they had probable cause to arrest the Defendant did so without a warrant in violation of *Payton* in that his mother rather than giving permission, Mrs. Fairchild rather than giving permission for the Officers to come in, conceded to their authority when they insisted on looking in the basement and upon looking in the basement, carrying on a further full search of the house finding the Defendant in an upstairs bedroom.
>
> After having viewed the testimony, viewed the credibility of the witness, I find first that there was lacking adequate probable cause for the arrest of Mr. Shelby at the time of his arrest, and given the circumstances of the arrest, even the testimony of the State's Officers, I find that there was a *Payton* violation as well.
>
> Accordingly, the motion to quash arrest to Andre Shelby will be allowed."

Thereafter, on August 17, 1988, Caples filed a motion to quash his arrest and suppress evidence. At the hearing on that motion, the parties stipulated to the testimony given at the earlier hearing on Caples' motion to suppress statements and Shelby's motions to suppress statements and to quash arrest and suppress evidence. There was also a stipulation that Caples was arrested without a warrant.

Detective Holmes was the only live witness at this hearing. Holmes said that John Williams, the eyewitness to the incident, gave him a description of "Big Mike"—about 20 years old, 6 feet to 6 feet 1 inch tall, around 200 pounds, with short hair. Williams also told Holmes that he saw "Big Mike" knock the victim to the ground and remove items from a tractor-trailer truck.

Holmes also said that Williams heard a conversation between two of the participants in which one called the other "Big Mike." To this, "Big Mike" responded "don't call out my name."

As to his conversation with Levi Boykins, Holmes testified that Boykins stated that he saw the incident. Boykins also described "Big Mike" as a black male, 6 feet 1 inch tall, and just under 200 pounds. Boykins thought that "Big Mike" was from the area of 47th and Prairie. Boykins also told Holmes that he saw "Big Mike" strike the victim with some kind of pipe. Prior to the interview with Boykins, the police had recovered a trailer crank handle used in the beating.

In granting Caples' motion to quash his arrest and suppress evidence, the court stated:

"The issue really isn't whether or not they had reasonable grounds to believe he was Big Mike, because Andre Shelby told them that he knew this person as Big Mike.

The issue is whether or not they had probable cause to arrest him for the homicide that he was arrested for. That's the question.

I think they had reasonable grounds to believe he was known as Big Mike, and I think they certainly had reasonable grounds to make an investigative stop.

My question is, adding the defendant's conduct [turning and trying to reenter the house without saying a word] to what the police already knew, was there probable cause to make an arrest? That's the essential issue as far as I can see.

\* \* \*

I think the police lacked probable cause to make an arrest. There's absolutely no question in my mind that they had reasonable grounds to approach Mr. Caples, to talk to him."

In reaching its conclusion that probable cause was lacking, the court considered the proximity in time and space of the incident and the arrest. It noted that as the passage of time and distance from the incident increases, so does the challenge of articulating probable cause. "This contact with Big Mike on the porch, so far distant from the event itself both in time and space, just requires something more than what the state was able to identify here, produce here."

When asked by defense counsel whether the court was attaching any significance to the finding of a *Payton* violation in the arrest of Shelby in its ruling on Caples' motion, the court answered in the negative, explaining:

"Just wanted to make clear that I was differentiating between my finding of no probable cause as to Andre Shelby and a *Payton* violation, because clearly if there had been an adequate report of information where the statement only barred by *Payton*, I think that information could be considered in forming probable cause for the purpose of determining probable cause as to Mr. Caples.

I don't think there would be any bar there. But there seems to be nothing significant in terms of what was reported by Mr. Shelby to add significantly enough to what the police already knew to justify the arrest of Mr. Caples."

The State subsequently filed a motion to reopen proofs and to reconsider Shelby's motion to quash his arrest. The motion was denied by the trial court.

The State now appeals from the granting of Shelby's and Caples' motions to quash their arrests and suppress the resultant evidence.

OPINION

The State contends that the trial court's rulings that police lacked probable cause to arrest these defendants and that defendant Shelby was illegally arrested in his home were manifestly erroneous. They predicate this contention on the fact that both defendants were implicated by a co-offender's (Boykins') statements, and those statements were substantially corroborated. Moreover, the State argues that exigent circumstances were present to justify Shelby's warrantless arrest in his home. Further, the State contends on appeal that if the arrests were improper, defendants' inculpatory statements were sufficiently attenuated from the illegal arrests so as to purge any taint.

With respect to both defendants, probable cause to arrest exists where the facts and circumstances known to the arresting officers at the time of the arrest are sufficient to warrant a man of reasonable caution to believe that an offense had been committed and that the offense was committed by the person arrested. (*People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605.) A determination of probable cause is governed by commonsense, practical considerations, and not by technical legal rules. (*People v. Tisler* (1984), 103 Ill. 2d 226, 469 N.E.2d 147.) It requires more than mere suspicion, yet does not require that the police have enough evidence to convict. (*People v. Moody* (1983), 94 Ill. 2d 1, 445 N.E.2d 275.) The existence of probable cause is determined by the totality of the cir-

cumstances at the time of the arrest. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Once a trial court has made a determination as to probable cause, a reviewing court will not disturb that ruling absent manifest error. *People v. Reynolds* (1983), 94 Ill. 2d 160, 445 N.E.2d 766.

Because the circumstances pertaining to the arrest and subsequent inculpatory statements of each of the co-defendants were significantly different, we shall address the State's contentions as they relate to each defendant separately.

ANDRE SHELBY

██ With respect to both Shelby and Caples, there was no question that an offense had been committed. However, with respect to Shelby, the only evidence presented as to what the police knew about Shelby's participation in that offense at the time they arrested him in his mother's house was given in the testimony of Detective Holmes. Levi Boykins had told Holmes that a person called "Andre" was involved, and had accurately described the exterior of "Andre's" house, as one of two places where he might be found. Although Boykins had given the police the names of others besides Shelby who were involved, and some of those names (but not Shelby's) were corroborated by another eyewitness, Williams, there was no other information conveyed to the police officers connecting him to the murder and burglary.

The State presents several cases for the proposition that a co-offender's statements implicating a defendant are sufficient to support a finding of probable cause. (*People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998; *People v. Wright* (1974), 56 Ill. 2d 523, 309 N.E.2d 537; *People v. Evans* (1976), 42 Ill. App. 3d 902, 356 N.E.2d 874; *People v. Brooks* (1976), 40 Ill. App. 3d 996, 353 N.E.2d 234.) These cases however, do not preempt the trial judge of his responsibility to assess the reliability of the informant upon whose information the arrest was carried out. In each of those cases, unlike the present case, the trial court denied the defendant's motions to quash in the first instance, and the reviewing court was asked to affirm the trial court's finding that probable cause did exist, a finding which upon review was left undisturbed pursuant to the applicable standard of review in such cases. Moreover, in each of those cases, the information supplied by the informant, albeit a co-offender, appeared to be more detailed and otherwise more reliable than the information in this case. See *James*, 118 Ill. 2d 214, 514 N.E.2d 998 (one suspect, under arrest for murder, armed robbery

and home invasion, admitted his participation and described in detail defendant's role in the crimes); *Wright*, 56 Ill. 2d 523, 309 N.E.2d 537 (one suspect in a robbery ring implicated the defendant and told police that the weapons used in the robberies could be found in defendant's apartment, and also told police that if they went to defendant's apartment before noon, they would have a chance of finding other members of the ring there as well as defendant); *Evans*, 42 Ill. App. 3d 902, 356 N.E.2d 874 (two suspects were interviewed by police, and both implicated a person named "Jerry," and further police investigation determined "Jerry" to be the defendant, who was arrested when he arrived at the police station pursuant to a telephone call from the police); *Brooks*, 40 Ill. App. 3d 996, 353 N.E.2d 234 (two participants in a murder had supplied police with defendant's name and address, and although the police had no description of the defendant, he identified himself by name to the police when they came to his house).

In each of those cases the court looked to the totality of the circumstances surrounding the arrest, including the information known to the police and the reliability of the informant, to determine that probable cause existed. (See *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) In none of those cases was it proposed or could it have been proposed that the uncorroborated statements of an arrestee will always constitute probable cause for an arrest as a matter of law. While we do not disagree with the State's contention that a co-offender's statements, if otherwise reliable, may provide a basis for probable cause, the test is whether the statement of the co-offender, as with any other informant, provides sufficient information and reliability that "a reasonable and prudent man, having knowledge possessed by the officer at the time of the arrest, would believe the defendant committed the offense." (*People v. Jackson* (1979), 72 Ill. App. 3d 231, 235, 390 N.E.2d 47.) The question we must resolve, therefore, is whether Boykins' statements, considered in light of the totality of the circumstances, were sufficient to establish probable cause to arrest Shelby.

Here, with respect to Shelby, Boykins had given the police only a first name of an alleged accomplice and no physical description of that person. Fairchild had told the police that her son was not at home, but had admitted that a male boarder and her boyfriend were in the house. Since they had no description of "Andre," and the record does not indicate that Shelby identified himself to the police, there is an insufficient basis to warrant their presumption

the person they found in the attic was indeed Shelby. We note that while Holmes said that the police attempted to obtain additional information about those Boykins named, there is no evidence that any further information was actually obtained. Further, the record does not indicate that Boykins had confessed to his participation in the crimes. (Compare *James*, 118 Ill. 2d at 224 (admission of involvement in crime enhances reliability of statement implicating co-offenders).) Nor was Boykins statement regarding "Andre's" involvement particularly detailed. (Compare *James*, 118 Ill. 2d 214, 514 N.E.2d 998 (where co-offender gave police a detailed description of James' role in the crime); *Wright*, 56 Ill. 2d 523, 309 N.E.2d 537 (where suspect told police weapons and other members of burglary ring would be found in defendant's apartment).) As the trial court noted, the nature of Boykins' identification of Shelby is not apparent.

Although an independent showing of the credibility or reliability of the co-offender and the basis of his knowledge is not required (see *Illinois v. Gates*, 462 U.S. at 238, 76 L. Ed. 2d at 548, 103 S. Ct. at 2332 (abandoning rigid two-pronged test of *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, and *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584)), the various indicia of reliability are nonetheless relevant as a part of the totality of the circumstances approach towards determining probable cause. (*James*, 118 Ill. 2d at 223.) "The information relied upon to establish probable cause to arrest must be supported by some indicia of reliability." (*James*, 118 Ill. 2d at 222.) Here, such indicia of reliability of the co-offender, such as independent verification, corroborating witnesses, admission of the crime and detailed statements, were not shown to be present.

As noted earlier, we will not overturn a trial court's ruling on a motion to suppress unless it is against the manifest weight of the evidence. "Manifestly erroneous or 'against the manifest weight of the evidence' is commonly understood to mean 'palpably erroneous and wholly unwarranted' [citation] or 'appears to be arbitrary, unreasonable, and not based upon the evidence.' " (*People v. Harris* (1991), 220 Ill. App. 3d 848, 860.) Applying this standard and the totality of the circumstances approach to the record in this case, considering both the relative paucity of what was related by Boykins to Holmes and the lack of any significant indicia of reliability of Boykins or his statements, we cannot say that the trial court's finding that the police lacked probable cause to arrest Shelby was error.

■■ As to the State's argument that the trial court erred in finding a violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371, we agree with the trial court's finding that the police lacked exigent circumstances to justify the arrest of Shelby in his home without a warrant.

As with a determination of whether probable cause existed, we look to the facts known to the officers at the time they acted to determine if exigent circumstances existed. The question is whether the police acted reasonably under those circumstances. (*People v. Hoddenbach* (1988), 169 Ill. App. 3d 499, 525 N.E.2d 888.) In *People v. Abney* (1980), 81 Ill. 2d 159, 407 N.E.2d 543, our supreme court identified several factors which may support a finding of exigent circumstances. These include the need for prompt action, the absence of any unjustified delay during which a warrant could have been obtained and the belief that the suspect was armed. Also to be considered are whether the police were acting on a clear showing of probable cause, whether the defendant was clearly identified as the assailant, whether the police had strong reason to believe that the defendant was on the premises, and whether the entry was peaceful. (*Abney*, 81 Ill. 2d at 171-72, 407 N.E.2d at 50-51.) Other factors may include the likelihood of the defendant's escape if he is not immediately arrested, and the hours of the arrest. (*People v. Yates* (1983), 98 Ill. 2d 502, 456 N.E.2d 1369.) Although all of these factors need not be present to find that exigent circumstances existed which would justify a warrantless arrest of a defendant in his home, we find that too few if any of them are present here.

The State contends that the warrantless in-home arrest was reasonable here due to the fact that the police were investigating a brutal murder. They were seeking a person who had used a pipe-like object to beat the victim to death. However, the police had already recovered this pipe-like object, and the State conceded that it had no reason to believe Shelby was armed. *Cf. People v. Dunagan* (1983), 118 Ill. App. 3d 474, 455 N.E.2d 542 (warrantless in-home arrest justified, in part, on officer's reasonable belief that defendant was armed and dangerous).

The State further urges that the police action was reasonable in that they acted within a few hours after they received information from Boykins which implicated Shelby. They cite several cases to support their argument that prompt action by the police after establishing probable cause may justify a warrantless in-home arrest. (*People v. Dunagan* (1983), 118 Ill. App. 3d 474, 455 N.E.2d 542; *People v. Thompson* (1981), 93 Ill. App. 3d 995, 418 N.E.2d 112;

*People v. Haynes* (1980), 89 Ill. App. 3d 231, 411 N.E.2d 876.) In each of those cases, however, there were additional circumstances which necessitated and justified the prompt action. (*Dunagan*, 118 Ill. App. 3d 474, 455 N.E.2d 542 (reasonable belief that defendant was armed and dangerous); *Thompson*, 93 Ill. App. 3d 995, 418 N.E.2d 112 (same); *Haynes*, 89 Ill. App. 3d 231, 411 N.E.2d 876 (strong probable cause and consensual entry to home to arrest).) Even assuming that the police in this case had probable cause to arrest Shelby, there is nothing in the record which would indicate that there was a necessity to act before obtaining a warrant. The police had no reason to believe that Shelby was armed and dangerous. There was no evidence that they had reason to believe that he would flee. The murder had occurred two days earlier, and he had not yet fled.

The police further urge that the man they allegedly observed in the basement gave them reason to believe that Shelby was in the house. However, the record is clear that at the time they had no description of Shelby and the trial judge, upon whom we must rely as the arbiter of credibility, found the police testimony about the man in the basement to be "farfetched."

Finally, the State argues that Mrs. Fairchild gave her consent to the entry and search of her house. However, the trial judge, upon whose credibility determinations we must rely, heard the testimony of the police and of Mrs. Fairchild and found otherwise.

Accordingly, we find no reason to disturb the trial court's ruling that a *Payton* violation occurred when the police, without a warrant and without consent, arrested Shelby in his mother's home at 4 a.m.

However, under the recent Supreme Court case of *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640, the statements made by Shelby after he was removed from his mother's house need not be suppressed even if the statements were made after a *Payton* violation, if probable cause existed for the arrest thereby making his detention lawful. (See *People v. Mackey* (1990), 207 Ill. App. 3d 839, 566 N.E.2d 449 (suppression of defendant's statements made outside the home after *Payton* violation not required where police had probable cause to arrest).) Therefore, the *Payton* violation by itself would not provide sufficient basis to suppress Shelby's statements made after he was removed from the premises. But we sustain the trial court's conclusion that these statements must be suppressed since, as previously discussed, the finding that the police did not have probable cause to arrest Shelby

was not against the manifest weight of the evidence. Therefore, the principle of *New York v. Harris* is not applicable here.

Finally, we address the State's argument that even if Shelby's arrest was illegal, his statements were sufficiently attenuated so as to be admissible. Shelby, however, points out that the issue of attenuation was not raised in the trial court and is therefore waived on appeal. We agree.

■ Issues not raised in the trial court may not generally be raised for the first time on appeal. (*People v. O'Neal* (1984), 104 Ill. 2d 399, 472 N.E.2d 441.) This principle applies equally to the State as to the defendant in a criminal case. (*People v. Adams* (1989), 131 Ill. 2d 387, 546 N.E.2d 561.) Although the State argued in the trial court that Shelby's statements should be admissible, they argued on the theory that there was probable cause for his arrest. Our review of the record indicates that at no time at the hearing on Shelby's motions did the State propose that attenuation might purge the taint of an illegal arrest. Moreover, the State filed a motion to reopen proofs and to reconsider Shelby's motion, and there again argued only that the arrest was lawful. "The [waiver] rule is founded on some rather basic considerations, which include the following: that litigation should not be presented piecemeal; and that all parties are entitled to have matters determined as quickly as possible and at one trial ***." (*People v. O'Neal* (1984), 104 Ill. 2d 399, 408, 472 N.E.2d 441.) By failing to present the theory of attenuation before the trial court, the State has waived the right to have this court consider that argument on review. See *People v. Adams* (1990), 131 Ill. 2d 387, 546 N.E.2d 561 (in trial court State objected to defendant's motion to suppress evidence based on probable cause, thereby waiving right to argue on review theory of a valid *Terry* stop).

CAPLES

■ Before reaching the question of probable cause for Caples' arrest, we must first address his contention that this court is without jurisdiction to hear this appeal. He points out that no ruling on the motion to quash arrest is recorded in the memoranda of orders included in the record on appeal, and that an appeal can be taken only from an order which is memorialized in a memoranda of orders or a written order. The State, however, has supplemented the record on appeal with copies of the half-sheets written by the trial judge on which the judge entered the order granting Caples' motion. Under Supreme Court Rule 272 (134 Ill. 2d R. 272), such a no-

tation by the trial judge is sufficient. Accordingly, we reject Caples' argument that we are without jurisdiction over this appeal.

■ The only issue we need address regarding defendant Caples is whether the police had probable cause to arrest him. We find that the trial court's determination that they did not is against the manifest weight of the evidence. The question of attenuation, therefore, even had it not been waived, is not reached. Also, since Caples was not arrested in his home, the question of a possible *Payton* violation is not applicable.

In ruling on Caples' motion, the court outlined the information known to the police prior to Caples' arrest.

> "They'd been given a name and a description by two asserted eyewitnesses. The name they had been given was Big Mike. They evidently thought they had probable cause to arrest Andre Shelby, although I arrived at a different conclusion hearing the motion to quash arrest there.
>
> And Andre Shelby, by coincidence someone is named Big Mike. And when he directed them to the place where Big Mike lived at 120th and Stewart, lo and behold, there's someone standing there who fits the physical description, six foot, six foot one, around 200, short hair.
>
> The police approached. No one has been arrested at this point, and Detective Holmes asks the question, are you Mike, at which point, according to the detective's testimony, I take that to be true, the subject, the defendant, Michael Caples, turns and tries to enter the home without saying a word. Just turns, tries to enter the home in order to evade the police officers."

The information which the police had regarding Caples is considerably more extensive and detailed than was their information regarding Shelby. In addition to Boykins naming "Big Mike" as a participant in the beating, Williams, an eyewitness, had also told the police that someone named "Big Mike" was involved. Also, both Boykins and Williams had described this person as 6 feet to 6 feet 1 inch tall, weighing approximately 200 pounds. Although a general description does not in itself establish probable cause to arrest one fitting that description (*People v. Williams* (1977), 53 Ill. App. 3d 266, 368 N.E.2d 679 (suspects described as "black teenagers")), a more detailed description may be sufficient (*People v. Williams* (1979), 79 Ill. App. 3d 817, 398 N.E.2d 1099 (defendant described as "male Negro, 5' 11", 170 pounds")). Moreover, here the same

description was given by two people. See *Williams*, 79 Ill. App. 3d 817, 398 N.E.2d 1099.

In addition, Williams told the police that he had seen Caples knock the victim to the ground, and Boykins told them that Caples had struck the victim with a pipe-like object. Also significant is Shelby's identification of Caples as "Big Mike."

Moreover, Caples' evasive maneuver upon seeing Shelby and the police outside his house in the early morning hours provides further support to the reasonableness of the officers' conclusion that this was the person who had committed the crime. While flight from the police alone may be insufficient to provide probable cause, when it is coupled with reasonable suspicion to stop an individual, probable cause may exist. (*People v. Beall* (1976), 42 Ill. App. 3d 452, 355 N.E.2d 756.) As previously noted, the court acknowledged that the police had reasonable grounds to make an investigative stop, but in granting Caples' motion, held that their information fell short of probable cause necessary to make an arrest.

Moreover, we respectfully disagree with the trial court's conclusion that the information reported by Shelby added nothing significant to what the police already knew. Shelby provided a critical nexus between the "Big Mike" described by Boykins and Williams and the defendant Michael Caples. After Shelby identified Caples as "Big Mike," a reasonable conclusion could be reached that this was the "Big Mike" whom two people, wholly separate and apart from one another, had physically described and had implicated in the beating.

"A probable cause conclusion may be drawn from the gestalt which a factual situation presents; that is, such a conclusion may be deducted from the separate facts as they interrelate, even though such a conclusion could not be reached if the separate facts were evaluated on an individual basis." (*United States v. Rubio* (7th Cir. 1968), 404 F.2d 678, 681.) Based on the totality of the circumstances known to the police at the time of Caples' arrest as shown in record before us, we find that the trial court's ruling that the police lacked probable cause to arrest Caples is against the manifest weight of the evidence.

The trial court, in finding a lack of probable cause, considered the fact that the arrest of Caples took place two days and at some distance from where the murder and burglary occurred, and concluded that those facts required more evidence than was presented to establish probable cause. Although the passage of time may affect the existence of probable cause where a search warrant is in-

volved, the same concern is not present when the issue is probable cause to arrest. (See *People v. Halliday* (1979), 73 Ill. App. 3d 615, 617, 392 N.E.2d 389 ("the question of the passage of time bears only upon the existence of probable cause [to search the premises]. More succinctly stated, has the passage of time made it unlikely that the object of the search is still present where the informer said it was?").) Probable cause to arrest, unlike probable cause to search, is not linked to a particular location. Also, with the passage of time, a person, as opposed to an inanimate object subject to a search warrant, can be expected to move. We can find no support for the proposition that with the passage of time and distance, the quantum of information necessary to establish probable cause to arrest increases.

Accordingly, for all the reasons above, the order of the circuit court quashing the arrest of Michael Caples and suppressing evidence is reversed and remanded, and the order of the circuit court quashing the arrest of Andre Shelby and suppressing evidence is affirmed.

No. 1—88—2706, Affirmed.
No. 1—88—3207, Reversed and remanded.

LORENZ, P.J., and MURRAY, J., concur.